IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

                                Plaintiff,

      v.                                       Criminal Action No. 3:13-CR-229-1

MAURICE LAMONT DYER,

                               Defendant.

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on a Motion to Suppress (ECF No. 29) by Defendant Maurice Lamont Dyer ("Dyer" or "Defendant"). For the reasons stated below, the Court will DENY Dyer's Motion.

**I.    BACKGROUND**

**A. Automobile Stop, Search, and Seizure at Pine Lake Drive**

In 2012, members of the Hanover County Sheriff's Office, in cooperation with the Henrico Police Department, began an investigation into the drug trafficking activities of two individuals, later identified as Walter West ("West") and Tyrone Nelson ("Nelson"). Both West and Nelson have been charged in a heroin trafficking conspiracy, along with Dyer.

Between November 2012 and August 2013, a series of seven separate purchases of heroin were made directly from West by law enforcement utilizing Nelson as an informant. In August 2013, law enforcement officers learned that, for approximately a seven to eight month period of time leading up to the arrest of Nelson and West, the two had been pooling their money together to purchase heroin for redistribution to their customers. Law enforcement officers subsequently learned that the heroin source of supply was an individual who went by the names "Reese" and/or "Mo" and dealt directly with Nelson.

On the date of Defendant's arrest, a description of the individual known as "Reese" or "Mo" was provided to law enforcement by Nelson.[1] Nelson also provided a description of the vehicles the supplier drove—two white vans—and the area where the supplier lived. An agent who was familiar with Dyer thought that the description provided by Nelson regarding the source of supply may in fact be Dyer. A picture of Dyer was obtained and shown to Nelson with all identifiers removed. Nelson confirmed that the person in the picture—Dyer—was in fact the heroin source of supply.

Nelson indicated that he typically bought three ounces of heroin from Dyer several times a week. Drug Enforcement Administration Task Force Officer Keith Parknow directed Nelson to call Dyer to attempt to buy three ounces of heroin. On August 22, 2013, a series of telephone calls were placed to Dyer. At the time, Dyer's phone number was listed in Nelson's cell phone under the name "Re." Nelson contacted Dyer, was unable to reach him, and left a message on Dyer's telephone. Dyer returned the call shortly thereafter, and the two had a conversation in which Nelson informed Dyer that he was looking for three hours of "studio time." Dyer agreed to deliver the "studio time" to Nelson's residence. Dyer did not ask for directions to Nelson's residence. Nelson explained to Officer Parknow that Dyer and he used coded language to discuss their drug business and further explained that "3 hours of studio time" referred to three ounces of heroin.

While arrangements were being made to purchase heroin from Dyer, law enforcement officers simultaneously set up surveillance units in the vicinity of Dyer's residence, identified as 8032 Arbor Glen Place, Henrico, Virginia ("Home"). After Nelson's order was placed, a black male was observed driving to the Home in a black Lincoln SUV bearing West Virginia license plates. The man drove into the driveway of the Home, exited the Lincoln SUV, entered and exited the Home, got back into the Lincoln SUV, drove to a white van, and then got into the

---

[1] Nelson was previously referred to as a confidential informant in the Government's briefing. During the suppression hearing, Nelson was revealed as the confidential informant supporting the traffic stop of Dyer and the subsequent warrants.

driver's seat of the white van. The man was in the white van approximately six minutes before he exited the van, got back into the Lincoln SUV, drove back up to the Home, exited the Lincoln SUV, and entered the Home yet again. Before the man left the Home, Nelson placed a second call to Dyer asking him when he was going to leave. Eventually, the man got back into the Lincoln SUV, pulled out of the driveway, and drove away from his Home. The man traveled directly to Nelson's residence.

Henrico County Police surveillance units followed the Lincoln SUV both in the air and on the ground. They watched as it drove directly to Nelson's residence at Pine Lake Drive without making any stops along the way. The man initially drove past the driveway of Nelson's residence, but then turned his vehicle back around when Nelson called Dyer to advise him that he was home. When the Lincoln SUV arrived at Nelson's house, Nelson positively identified Dyer as the driver of the vehicle and as the heroin supplier he had called earlier. When Dyer pulled into the driveway of Nelson's residence, law enforcement officers approached the vehicle and Dyer was positively identified and detained ("Pine Lake Drive Stop"). Hanover Sheriff's Investigator Stem searched the driver's compartment of Dyer's Lincoln SUV, where he recovered a Chipotle Restaurant napkin secured with a rubber band. Inside the napkin was a plastic Ziploc bag with approximately three ounces of suspected heroin inside it. Dyer was arrested and, in a search of the Lincoln SUV incident to arrest, law enforcement officers recovered $26,889 in United States currency. Dyer was brought to the police department, where he was read his rights pursuant to *Miranda* by Officer Parknow. Dyer stated that he understood his rights and agreed to speak with law enforcement. Dyer stated that he had gone to the location where he had been arrested to discuss the music business. Dyer advised that he is a promoter and that his co-defendant, Nelson, is a rap artist.

B.  **The Search Warrant for Dyer's Home**

After Dyer was arrested, members of the Henrico County Police Department drafted an affidavit in support of a search warrant for the Home. The affidavit for the search warrant was

3

submitted by Detective Christopher Briggs of the Henrico Police Department to Magistrate Jeffrey B. Znotens on August 22, 2013. The search warrant requested authorization for law enforcement to search the Home, the curtilage, and any and all vehicles and outbuildings on the property.

In the Affidavit, Detective Briggs indicated that members of the Henrico County Police Drug Enforcement Unit ("DEU") had previously executed a search warrant at Pine Lake Drive as a part of an ongoing investigation. The subject of the investigation reportedly had outstanding indictments for the distribution of Schedule I drugs, and Detective Briggs reportedly took the subject of the investigation into custody for his outstanding indictments for distribution of heroin. Detective Briggs indicated that a confidential informant had identified Dyer as his supplier of heroin.

The affidavit indicated that the informant was reported to have been able to identify a photograph of Dyer as a "Reese." Detective Briggs then reported that a phone call was placed by the informant to a number known to belong to Dyer and that Dyer answered the phone and agreed to meet with the informant to facilitate a transaction of a quantity of suspected heroin. Detective Briggs indicated that surveillance units set up around the area of the Home watched a black male pull up to the Home in a black Lincoln SUV, exit and enter the Home, get back into the Lincoln SUV, enter and exit other vehicles on the property, walk around the property, and finally, exit the driveway of the Home. Detective Briggs reported that units then followed the SUV to Pine Lake Drive where the driver and sole occupant was identified as Dyer. Dyer was then reportedly taken into custody and a quantity of heroin consistent with the quantity f heroin ordered by the confidential informant was found in the SUV including some amount of United States Currency. Detective Briggs then argued that he knew, through his training and experience with the distribution and possession of illegal drugs, that illegal drugs, assets, records, and documents pertaining to illegal activities were likely to be found in the Home and any and all outbuildings on the property. Detective Briggs then concluded that he strongly believed that

heroin, records, currency, documents, and other instrumentalities that are commonly associated with the illegal distribution of controlled substances would be found in the Home.

In support of the informant's veracity, Detective Briggs asserted that the informant made statements against his penal interest regarding his distribution activities and his source of supply for heroin. Detective Briggs also indicated that the information provided was corroborated by a photo identification of Dyer and by phone calls placed to Dyer ordering a quantity of heroin that was intercepted at Pine Lake Drive. Detective Briggs noted that the quantity of heroin recovered from the Pine Lake Drive Stop was the same as the amount of heroin ordered by the informant. Finally, Detective Briggs attested to his experience as a police officer of thirteen years and two months and to his experience as a member of the Organized Crime Section of the Henrico County Police Division for eight years.

### C.  The Search Warrant for the Two Vans

Two vans that were parked in front of the Home were towed to a secure impound lot. Although the search warrant authorized a search of all vehicles on the property, the vehicles were towed for purposes of asset forfeiture, and separate search warrants were secured the following day for these vehicles. The first vehicle, a 2011 GMC Savannah conversion van ("GMC Van"), bearing a Virginia license plate WSR-4335, was registered to Dyer and fit the description of the van from which Dyer had previously supplied heroin. The second vehicle, a 2007 Chevrolet van ("Chevrolet Van") bearing Virginia license plate TX86231, was the white van that Dyer had been observed entering and exiting just prior to delivering the three ounces of heroin. The affidavit for the search warrant was submitted by Detective Christopher Briggs of the Henrico Police Department to Magistrate R. Ibanez on August 22, 2013.

The search warrant for the vans contained substantially the same information as was proffered in the affidavit for the search warrant for the Home. Additionally, Detective Briggs reported that the substance found in the Lincoln SUV driven by Dyer was in fact heroin in an amount consistent with that previously ordered by the informant. Additionally, Detective Briggs

indicated that over $225,000 was hidden in varying locations in the Home and in vehicles located near the Home. Detective Briggs noted that a drug-detecting K-9 gave a positive drug screen for the Chevrolet Van. Detective Briggs also reported that detectives from the Hanover County Sheriff's Department had provided information that an informant had purchased heroin from Dyer while Dyer was operating a vehicle similar to the GMC Van. Further, Detective Briggs reported that the GMC Van was seized because it was implicated in several heroin transactions between an informant and Dyer. Detective Briggs represented that a bundle of cash was also found in the GMC Van after an inventory search of the vehicle. Detective Briggs then stated that the two vans would likely contain evidence in substantial connection with the investigation.[2]

In support of the informant's veracity, Detective Briggs asserted that the informant made statements against his penal interest regarding his distribution activities and his source of supply for heroin. Detective Briggs also indicated that the information provided was corroborated by a photo identification of Dyer and by phone calls placed to Dyer ordering a quantity of heroin that was intercepted at Pine Lake Drive. Detective Briggs noted that Dyer was known to members of the DEU as a distributor of heroin. Detective Briggs additionally stated that the quantity of heroin recovered from the Pine Lake Drive Stop was the same as the amount of heroin ordered by the informant. Finally, Detective Briggs attested to his experience as a police officer of thirteen years two months and to his experience as a member of the Organized Crime Section of the Henrico County Police Division for eight years.

### D. Procedural Background

Dyer filed the instant Motion to Suppress on March 12, 2014. The Government filed its opposition on March 28, 2013. Defendant filed his reply on April 11, 2014. A hearing on the

---

[2] The Hanover Sheriff's Office, with assistance from members of the Drug Enforcement Administration, assisted in executing the search warrant for the Home. In all, $369,056 in United States currency, more than one hundred grams of heroin, and multiple vehicles were seized. Virginia Employment Commission records revealed that at the time of his arrest, Dyer was not reporting any income.

Motion to Suppress was held on May 13, 2013, at which the Court denied the Motion by oral order.

## II.     DISCUSSION

### A.  Probable Cause to Stop the Vehicle

The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search is *per se* unreasonable under the Fourth Amendment—with few exceptions—if it is not conducted pursuant to a valid warrant. *Katz v. United States,* 389 U.S. 347, 357 (1967). The "automobile exception," however, is one of the few exceptions to this requirement. Under the automobile exception, law enforcement agents may search a vehicle without a warrant "if [the vehicle] is readily mobile and probable cause exists to believe that it contains contraband." *United States v. Brookins*, 345 F.3d 231, 238 (4th Cir. 2003) (quoting *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "Although *Gates* outlines the probable cause necessary to support a warrant, the underlying principle and the totality of the circumstances test have been applied to probable cause for a warrantless arrest as well." *United States v. Williams*, 10 F.3d 1070, 1074 (4th Cir. 1993) (citing *United States v. McCraw,* 920 F.2d 224 (4th Cir. 1990)). Thus, probable cause for a warrantless arrest is determined by the totality of circumstances, as seen from the point of view of "an objectively reasonable police officer." *See Ornelas v. United States,* 517 U.S. 690, 696 (1996). The existence of probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). It does not, however, require an actual showing of criminal activity. *Id.* at 243 n.13. It is true that the wholly innocent facts cannot, alone, provide the basis for probable cause. *See United States v. Foster,* 634 F.3d 243, 248 (4th Cir. 2011). But, "'[t]he possibility of an innocent explanation does not vitiate properly established probable cause.'" *Sennett v. United States,* 667 F.3d 531, 537 (4th Cir. 2012) (internal citation omitted).

Where probable cause is supported by an informant's tip, the degree to which an tip is corroborated is an important factor. *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993). "Although the informant's veracity, reliability and basis of knowledge are relevant, they are no longer independent requirements." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). Further, "[c]orroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the reports are also correct." *Id.* at 1581.

### 1. Reliability of Nelson as an Informant

Here, there is no indication that Nelson had provided reliable information about other drug deals to law enforcement officers in the past. However, there are certain indicia of reliability concerning Nelson's tip. First, Nelson made declarations against his penal interest when he indicated that Dyer was his source of supply and that he had purchased heroin from Dyer on multiple occasions. *See United States v. Harris*, 403 U.S. 573, 583 (1971) ("That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct."). Second, because Nelson stated that he had purchased drugs from Dyer multiple times, the foundation for Nelson's knowledge was known to law enforcement prior to the Pine Lake Drive Stop. *See Lalor*, 996 F.2d at 1581. The ability of Nelson to describe the vehicles Dyer drove, the area where Dyer lived, and to identify Dyer in a picture also provides at least some foundation for Nelson's knowledge. *See id.*

### 2. Independent Corroboration by the Government

Even if Nelson were unreliable, the Government was able to provide independent corroboration necessary to bolster Nelson's tip and the Government's estimation of probable cause. The reliability of Nelson's tip may be bolstered where the Government was able to independently corroborate it. *See Gates,* 462 U.S. at 244 ("[A]n informant [who] is right about some things . . . [is] more probably right about other facts."); *see also Draper v. United States*, 358 U.S. 307, 313 (1959) (same).

8

Dyer asserts that the Government relies solely on (1) an alleged phone conversation between Nelson and Dyer about studio time that was believed to be a metaphor for selling drugs and (2) Dyer's activities at his Home immediately after his call with Nelson. Dyer's theory is that the Government relies on seemingly innocent facts to establish that they independently corroborated Nelson's report. However, Dyer asks this Court to ignore a substantial amount of additional evidence relied upon by the Government. For instance, officers were also able to corroborate the fact that Dyer knew Nelson in some capacity because Dyer spoke with some familiarity with Nelson and knew the location of his residence at Pine Lake Drive. Further, officers were able to corroborate the fact that Dyer and Nelson knew each other in some capacity because they used a coded language to discuss drug business. As noted by the Government, "time" is not something that needs to be delivered to a specific location.[3] Nelson was able to confirm that his source of supply was a man by the name of "Mo" or "Reese," which law enforcement agents inferred was short for Maurice. Officers also observed Dyer entering and exiting his Home and a van shortly after receiving the order for "studio time" by Nelson. Moreover, the ability of Nelson to describe the vehicles Dyer drove, the area where Dyer lived, and to identify Dyer in a picture lends at least some credence to his allegations of criminal activity. *See Lalor*, 996 F.2d at 1581.

As noted by the Fourth Circuit in *Lalor*, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." 996 F.2d at 1581 (quoting *Gates*, 462 U.S. at 243); *see also United States v. Humphries,* 372 F.3d 653, 657 (4th Cir. 2004) (holding that courts should also consider "an officer's practical experience and the inferences the officer may draw from that experience."). Under the totality of the circumstances, the Court finds that law enforcement officers possessed sufficient probable cause to stop and

---

[3] It is not unheard of for law enforcement officers to infer criminal activity from Defendant's use of coded language. *See United States v. Rawson*, No. 93-3780, 1994 WL 142761, at *2 (6th Cir. April 19, 1994) ("The informant explained . . . that the term "transmission" was a code . . . used to signify that he had a sum of money ready for the informant to take to Youngstown. Although [the defendant] ran an automobile repair business out of his home, the informant did not have a car at [the defendant's] shop for repair.").

arrest Dyer, search the Lincoln SUV that he was driving, and seize suspected illegal drugs and related evidence.

### B. Sufficiency of the Warrants

In reviewing a magistrate's determination of probable cause, the court must ascertain whether there was a "substantial basis for . . . conclud[ing] that probable cause existed." *Brookins,* 345 F.3d at 236-38. In doing so, the courts should give the magistrate's determination "great deference," and not invalidate warrants by interpreting affidavits in a hypertechnical, rather than commonsensical, manner. *Id.* at 236; *see also United States v. Gary,* 420 F. Supp. 2d 470, 476 (E.D. Va. 2006)*, aff'd,* 528 F.3d 324 (4th Cir. 2008). In determining the validity of the search warrant, the Court limits itself to the four corners of the affidavits of Detective Briggs, as presented to Magistrates Jeffery B. Znotens and R. Ibanez. *See Gates,* 462 U.S. at 238.

Here, law enforcement officers did not simply present "bare bones" affidavits, relying on anonymous informants without corroboration or independent investigation of the facts alleged. *See United States v. Wilhelm,* 80 F.3d 116 (4th Cir. 1996). Detective Briggs relies on virtually the same information that supported the Pine Lake Drive Stop to support the warrants to search for heroin, records, currency, documents, and other instrumentalities commonly associated with the illegal distribution of controlled substances in Dyer's Home, the Chevrolet Van, and the GMC Van. In addition, Detective Briggs cites to the fact that a quantity of the suspected heroin consistent with the quantity of heroin ordered by Nelson was found when Dyer was then taken into custody at the Pine Lake Drive Stop. These facts support probable cause to issue a warrant for the Home.

Regarding the warrant for the search of two vans, the Government was able to proffer additional evidence including $225,000 hidden in various locations of Dyer's home, a positive reaction from a drug-detection K-9 as to the Chevrolet van, and Dyer's ownership of the GMC Van. These facts support probable cause to issue a warrant for GMC van and the Chevrolet van.

//

### C. *Terry* Stop at Pine Lake Drive

To be lawful, a *Terry* stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440 (1980). The level of suspicion must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). As such, "the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21 (1968).

Because there was probable cause for the Pine Lake Drive Stop, whether there was reasonable suspicion is a moot point. As stated previously, law enforcement officers were aware of multiple indications of criminal activity including a report by an informant and recorded phone calls between Nelson and Dyer. Taken together, these facts support at the very least a *Terry* stop of Dyer by law enforcement.

### III. CONCLUSION

For the reasons stated above, the Court will DENY Dyer's Motion.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this __3rd_____ day of June 2014.

11